UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

**NDN Drywall, Inc.,**                                                  Civil No. 04-CV-4706 (DSD/SRN)

      **Plaintiff,**

      v.                                                              REPORT & RECOMMENDATION

**Custom Drywall, Inc.,**

      **Defendant**

___

William E. Dornbos, Esq., on behalf of Plaintiff

R. Daniel Rasmus, Esq., on behalf of Defendant

___

SUSAN RICHARD NELSON, United States Magistrate Judge

      The above entitled matter came before the undersigned United States Magistrate Judge on Defendant's Motion to Dismiss (Doc. No. 6.)  This case has been referred to the undersigned for resolution of pretrial matters pursuant to 42 U.S.C. § 636 and Local Rule 72.1.

**I.    BACKGROUND**

      Plaintiff is in the business of installing and finishing drywall for residential and commercial construction projects.  Vivian Guerra, the President and sole shareholder of Plaintiff corporation, is Native American.  (Complaint, ¶ 1.)  Defendant is also in the business of installing and finishing drywall for construction projects, but is not a minority-owned business.  (Id., ¶ 2.)

      In August 2002, Defendant approached Plaintiff about forming a joint venture for the purpose

1

of obtaining construction contracts for projects that had minority-owned business participation requirements. (Id., ¶ 7.) The Complaint claims that Defendant limited its business proposal to only those projects that had minority-owned business participation requirements "because of the race of Ms. Guerra, the owner of NDN Drywall." (Id.) The Complaint further asserts that the parties did not reach an agreement at the time of their initial discussions; instead, Ms. Guerra informed Defendant of her interest in a collaboration, but requested that the agreement be reduced to writing. (Id.)

Plaintiff alleges that the following representations were made to her by Defendant in August 2002: (1) that the parties would be equals in the joint venture; (2) that Plaintiff would have an active role in securing contracts; (3) that Plaintiff would be able to perform a significant amount of the work on projects once contracts had been secured; and (4) that Plaintiff would receive profits in proportion to its work on contracts. (Id., ¶ 8.) According to the Complaint, Plaintiff relied on these representations when it entered into the joint venture agreement ("JVA") with Defendant.

The Complaint alleges that prior to entering into the JVA, Defendant began bidding on construction contracts for projects with a minority-owned business participation requirement by falsely representing to general contractors and others that it was part of a joint venture with Plaintiff and that Plaintiff would be performing work on the projects for which it submitted bids. (Id., ¶ 9.) Plaintiff further contends that Defendant intentionally attempted to deceive general contractors by causing them to believe that it was in a joint venture with Defendant, when no such relationship existed. (Id.)

Plaintiff's Complaint also alleges that in December 2002, Defendant filed with the Minnesota Secretary of State a Certificate of Assumed Name for the name, "NDN-Custom Drywall." Plaintiff contends that this filing occurred without Plaintiff's authorization or knowledge. (Id., ¶ 10.)

On January 3, 2003, the parties entered into the JVA. (Complaint, Ex. A.) The parties agreed to "constitute themselves as joint venturers solely for the purpose of supplying the materials and performing the work and labor required on the Qualified Construction Contracts." (Id.) The JVA defined Qualified Construction Contracts as those involving requirements for "minority participation," "minority set aside," and "utilization requirements" or "affirmative action guidelines or other similar programs." (Id.) As to the scope and description of the contract, it provided:

> Custom and NDN hereby associate themselves as joint venturers for the purpose of (1) preparing and submitting bids pursuant to invitations for bids with respect to Qualified Construction Contracts which are approved by both Venturers; (1) if awarded any contract pursuant to a bid on a Qualified Construction Contract, the purpose of the Joint Venture shall be deemed to include the performing and completing of such contract in accordance with the terms of the bid including change orders.

(Id.)

Regarding the effect of the JVA on independent transactions, the contract states:

> It is the intent of the parties hereto to limit joint operations to those operations specified herein. This Agreement has no relation to any operations conducted by either party, individually or as joint parties with others. Any transactions between the Joint Venture and a party hereto shall be based on a full disclosure of all conditions and shall be conducted in good faith and with fair dealing. Each party shall be liable to the other party and to the Joint Venture for any damages occasioned by that party's misrepresentations, or failure to make full disclosure.

(Id.)

Finally, the contract provides that the agreement constitutes the entire agreement between the parties. (Id.)

Plaintiff filed this suit, bringing discrimination claims under 42 U.S.C. § 1981 and Minn. Stat. § 363A.17, the Minnesota Human Rights Act ("MHRA"). Plaintiff alleges that Defendant effected this discrimination as follows: (1) by limiting the JVA to only projects involving goals or requirements for

3

minority-owned businesses; (2) by refusing to bid on behalf of the joint venture for contracts on projects that did not have goals or requirements for minority-owned business participation; (3) by refusing to allow Plaintiff to perform work on contracts secured by the joint venture; (4) by refusing to pay profits to Plaintiff; and (5) by denying Plaintiff access to the financial books of the joint venture. (Complaint at ¶¶ 25, 28.) In addition, Plaintiff alleges trade practices violations under 15 U.S.C. § 1125 and Minn. Stat. § 325D.44, breach of contract and fraud claims. (Complaint at ¶¶ 30-41.)

Defendant moves to dismiss Counts I and II, which allege racial discrimination pursuant to 42 U.S.C. § 1981 and Minn. Stat. § 363A.17. Defendant argues that it had no contractual obligation to pursue non-minority set aside contracts through the JVA, nor did it interfere with Plaintiff's right to contract with third parties. (Def.'s Mem. Supp. Mot. Dismiss at 1.) Defendant also alleges that Plaintiff has no standing to pursue its discrimination claims.

Defendant also moves to dismiss Count III, which alleges Lanham Act violations under 15 U.S.C. §1125, and Count IV, which alleges violation of the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. § 325D.44. Defendant contends that Plaintiff has no standing and fails to plead all the elements of a Lanham Act Claim. Further, Defendant contends that because the MDTPA fails to provide for damages, Plaintiff's claim must be dismissed.

Plaintiff counters that it possesses standing under § 1981, the MHRA and the Lanham Act and that all of its allegations adequately state a claim under those statutes. Plaintiff does not address Defendant's motion to dismiss its claims under the MDTPA.

## II. DISCUSSION

When considering a motion to dismiss for failure to state a claim upon which relief may be

granted under Federal Rule of Civil Procedure 12(b)(6), "we must assume that all the facts alleged in the complaint are true" and generally construe the complaint in the light most favorable to the plaintiff. E.g., Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994). Although "the complaint must contain sufficient facts, as opposed to mere conclusions, to satisfy the legal requirements of the claim to avoid dismissal," DuBois v. Ford Motor Credit Co., 276 F.3d 1019, 1022 (8th Cir. 2002), a court "may dismiss 'only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations.'" E.g., Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995).

### A.      Standing to Bring Racial Discrimination Claims

Defendant argues that Plaintiff lacks standing to bring a § 1981 claim. Defendant states that the Supreme Court has not directly ruled on whether a corporation has imputed racial identity to confer standing. (Def.'s Mem. Supp. Mot. Dismiss at 18.)

Constitutional standing concerns whether the plaintiff's personal stake in a lawsuit is sufficient to create a concrete "case or controversy" to which the federal judicial power extends under Article III, § 2, of the Constitution. Thinket Ink Information Resources, Inc. v. Sun Microsystems, Inc., 368 F.3d 1053, 1057 (9th Cir. 2004). In addition to the requirements of Article III standing, we must consider the judicially imposed prudential limits on standing. The test for prudential standing is "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." Oti Kaga, Inc. v. South Dakota Housing Development Authority, 342 F.3d 871, 888 (8th Cir. 2003). Cases in which corporations seek relief under federal discrimination laws have involved analysis of whether the defendant corporations have

5

prudential standing. See, Oti Kaga, 342 F.3d at 888; D.B. Indy v. Talisman Brookdale, LLC, No. 04-CV-1023 (PAM/JSM), 2004 WL 1630976 (D. Minn. July 20, 2004).

Notably, the leading cases applicable here, Oti Kaga and D.B. Indy, involve slightly different facts than this case. In Oti Kaga, the inquiry was whether a non-profit corporation established and operated by Native Americans had prudential standing to assert a racial discrimination claim under the Fair Housing Act. 342 F.3d at 882. In D.B. Indy, the question was whether a for-profit corporation had prudential standing to assert civil rights discrimination claims as a result of a defendant's racial prejudice against unnamed third parties. 2004 WL 1630976 at *3. In Oti Kaga, the Eighth Circuit found that the non-profit corporate plaintiff possessed prudential standing:

> Oti Kaga was created to acquire, construct and operate rental housing and related facilities on the Cheyenne River Sioux Indian Reservation. The alleged discrimination has directly affected Oti Kaga's economic interests and its ability to realize its corporate purpose. As such, Oti Kaga is a logical and more effective adversary to combat the alleged discrimination than an individual plaintiff alleging an inchoate interest in the Elk View developments.

342 F.3d at 882.

Distinguishing Oti Kaga, this Court reached the opposite result and concluded that the plaintiff in D.B. Indy did not have standing:

> Unlike the corporate plaintiff in Oti Kaga, D.B. Indy is a corporation that sells men's clothing, that was organized to provide a financial return to its shareholders. D.B. Indy is not an entity that was specifically created to benefit minority interests. This distinction is fatal to D.B. Indy's claims. Moreover, the Court is unpersuaded that D.B. Indy is in the best position to challenge Brookdale's alleged discrimination. Thus, the Court finds that D.B. Indy lacks prudential standing to pursue its discrimination claims.

2004 WL 1630976 at *3.

Here, Plaintiff has sufficiently alleged an injury-in-fact to confer constitutional standing. For

example, Plaintiff alleges that Defendant excluded Plaintiff from the operations and management of the joint venture, has given it only a token amount of work, and has refused to pay profits to Plaintiff. (See Complaint at ¶¶ 19, 25.) Plaintiff alleges that Defendant's discriminatory actions caused it to lose contracts, work and profits. (Id. at ¶¶ 25, 28.) For this, Plaintiff requests damages. (Id., Prayer for Relief.)

As to prudential standing, federal courts have held that corporations have prudential standing to pursue race discrimination claims under § 1981. See, e.g., Oti Kaga, 342 F.3d at 881; Thinket Ink Information Resources, Inc., 368 F.3d at 1059 (African-American-owned business had prudential standing to bring § 1981 action because it had acquired imputed racial identity to place it within § 1981's zone of interest); Howard Security Services, Inc. v. Johns Hopkins Hospital, 516 F.Supp. 508, 513 (D. Md. 1981) (Plaintiff closely held corporation was wholly owned and operated by black owner; under these circumstances, corporation had a cause of action under § 1981).

Here, unlike the corporate plaintiff clothing store and its minority customers in D.B. Indy, Plaintiff corporation is closely associated with its minority owner, Ms. Guerra. In fact, as in the Howard Securities case, Ms. Guerra is the sole owner and President of Plaintiff corporation. (Complaint, ¶ 1.) Her legal and economic interests overlap with those of Plaintiff corporation, unlike the plaintiff clothing store in D.B. Indy and its customers. In addition, in D.B. Indy, it was the plaintiff's customers, not the corporate plaintiff itself, which was the target of racial discrimination. See D.B. Indy, 2004 WL 1630976 at * 3. In contrast, here, Plaintiff corporation has alleged that it was the target of discrimination and has sustained injury as a result. Thus, this case is distinguishable on its facts from D.B. Indy. As with the plaintiff in Oti Kaga, Plaintiff is a logical entity to bring such claims and

satisfies the requirements for prudential standing. Having concluded that Plaintiff possesses standing to bring § 1981 and MHRA claims, the Court turns to whether Plaintiff has adequately stated a claim for which relief may be granted.

  B. <u>Racial Discrimination Claims Under 42 U.S.C. § 1981 and Minn. Stat</u>
    **§ 363A.17**

As discussed, <u>supra</u>, Plaintiff alleges violations of 42 U.S.C. § 1981 and Minn. Stat. § 363A.17, the MHRA. Under § 1981, racial discrimination in the making and enforcement of contracts is prohibited:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . ."

42 U.S.C. § 1981(a).

The provision of the MHRA under which Plaintiff states its allegations provides:

> It is an unfair discriminatory practice for a person engaged in a trade or business or in the provision of a service:
>
>       \*\*\*
>
> (c) to intentionally refuse to do business with, to refuse to contract with, or to discriminate in the basic terms, conditions, or performance of the contract because of a person's race, national origin, color, sex, sexual orientation, or disability, unless the alleged refusal or discrimination is because of a legitimate business purpose.
>
> Nothing in this section shall prohibit positive action plans.

Minn. Stat. §363A.16(c).

Plaintiff alleges that Defendant discriminated against it on account of the race of Ms. Guerra and

8

thereby violated 42 U.S.C. § 1981 and the MHRA by:  (1) limiting the JVA to only projects involving goals or requirements for minority-owned businesses; (2) refusing to bid on behalf of the joint venture for contracts on projects that did not have goals or requirements for minority-owned business participation; (3) by refusing to allow Plaintiff to perform work on contracts secured by the joint venture; (4) by refusing to pay profits to Plaintiff; and (5) by denying Plaintiff access to the financial books of the joint venture.  (Complaint, ¶¶ 25, 28.)

Plaintiff's claims under § 1981 and the MHRA are the same and Defendant's arguments in support of this motion to dismiss those claims are likewise identical.  Because of the similarity between the federal and state laws, Minnesota courts look to federal courts for guidance and have adopted many of the principles employed in federal cases for resolving such disputes.  See Khalifa v. State, 397 N.W.2d 383, 387-88 (Minn. App. 1986); Gold Star Taxi and Transp. Service v. Mall of America Co., 987 F.Supp. 741 (D. Minn. 1997) (examining both MHRA and § 1981 claims without distinguishing between the two in the legal analyses).  In light of the similar legal analyses and the similar counts pled, the Court thus analyzes both claims together.

The Ninth Circuit has stated, "In order to withstand a motion to dismiss for failure to state a claim, a § 1981 cause of action need only allege 'that plaintiff suffered discrimination. . .on the basis of race.'" Parks School of Business, Inc. v. Symington, 51 F.3d 1480, 1487 (9th Cir. 1995) (citations omitted).

Although the Eighth Circuit has not articulated such a direct statement, it has applied a liberal standard to a § 1981 plaintiff's pleadings, holding that where the plaintiff employee alleged that she was treated adversely and differently than her white counterparts, that she was denied promotions and other

benefits and customary accoutrements of her position by her former employer on account of her race, and that such conduct violated Title VII and "other federal laws," that such a pleading was sufficient to state a claim against the defendant for racial discrimination under § 1981. Smith v. Ouachita Technical College, 337 F.3d 1079, 1080 (8th Cir. 2003). Again, the Court is mindful of the standard of review on a motion to dismiss, which requires that "we must assume that all the facts alleged in the complaint are true" and generally construe the complaint in the light most favorable to the plaintiff. E.g., Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994)

### 1. Allegation that JVA is Discriminatory on its Face

Plaintiff claims that the JVA violates § 1981 because it is limited to only projects involving goals or requirements for minority-owned businesses, Complaint, ¶¶ 25, 28, but Plaintiff does not otherwise argue that the contract is defective or invalid. Instead, Plaintiff contends that should the court find the agreement to be discriminatory on its face, the discriminatory term can simply be stricken from the agreement, which otherwise remains valid. Plaintiff, however, cites no case law supporting its position that it is discriminatory for two parties to engage in a joint venture for the sole purpose of seeking minority contracts.

In Minnesota, the elements of a joint venture require the following:

(a) Contribution – the parties must combine their money, property, time, or skill in some common undertaking, but the contribution of each need not be equal or of the same nature.

(b) Joint proprietorship and control – there must be a proprietary interest and right of mutual control over the subject matter of the property engaged therein.

(c) Sharing of profits but not necessarily of losses – there must be an express or implied agreement for the sharing of profits (aside from profits received in payment of wages as

10

an employee) but not necessarily of the losses.

(d) Contract – there must be a contract, whether express or implied, showing that a joint venture was in fact entered into.

Rehnberg v. Minnesota Homes, 52 N.W.2d 454, 457 (Minn. 1952) (cited in W.S.A., Inc. v. Liberty Mutual Ins. Co., No. CV-3-92-162, 1992 WL 544960 (D. Minn. Sept. 30, 1992)).   These elements are satisfied in the JVA at issue here and Plaintiff does not argue that the entire JVA is invalid.

Courts have recognized that federal agencies and entities such as the Small Business Administration ("SBA") have authority to approve joint ventures comprised of minority and non-minorities for the purpose of securing qualified contracts, or minority set-aside contracts. See, e.g., Apex Construction Co., Inc. v. United States, 719 F.Supp. 1144, 1149-50 (D. Mass. 1989) (citing SBA criteria for approving minority/non-minority owned joint ventures created to secure qualified contracts). Although this JVA is not part of a SBA minority contract program, its underlying purpose is no different from contracts made via SBA programs designed to promote minority participation. In addition, both parties freely entered into the JVA and agreed that the JVA constituted the entire agreement between the parties. (Ex. A to Complaint.)   For all of these reasons, the Court finds that the JVA is not discriminatory on its face.

Finally, the Court doubts that if the allegedly discriminatory provision were stricken from the contract, that Plaintiff would have a basis on which to support any of its claims.   The agreement to join together to bid on minority contracts essentially comprises the entirety of the JVA. Absent that provision, there is no agreement.

 Thus, the Court concludes that Plaintiff's §1981 and MHRA claims based on the allegation

that the JVA is discriminatory on its face fail to state a claim upon which relief may be granted. Accordingly, the § 1981 and MHRA claims based on those allegations should be dismissed and Defendant's motion should be granted as to those portions of Plaintiff's claims.

### 2. Allegation that Defendant Refused to Bid on Behalf of Joint Venture for Contracts without Minority Goals or Requirements

The Court next considers that portion of Plaintiff's §1981 and MHRA claims based on the allegation that Defendant refused to bid on behalf of the joint venture for contracts that did not have goals or requirements for minority-owned business participation. See Complaint at ¶¶ 25, 28.

The JVA is instructive, as it states that "Custom and NDN hereby constitute themselves as joint venturers solely for the purpose of supplying the materials and performing the work and labor required on the Qualified Construction Contracts which the joint venture shall or may hereafter enter into." (Ex. A to Complaint.) Thus, the sole purpose of the JVA was to obtain minority-based contracts. Plaintiff, however, argues that it contemplated additional, non-minority-based business, alleging, "Though NDN Drywall did not wish the joint venture to be limited to only projects involving minority participation goals or requirements, it was hopeful that Custom Drywall would also decide to include it on contracts that did not have such participation goals or requirements." (Complaint at ¶ 12.) These 'hopes' and 'wishes' for a more expansive agreement, however, are not found within the unambiguous language of the JVA.

In Harris v. Allstate Ins. Co., 300 F.3d 1183 (10th Cir. 2002), a minority business owner that repaired and cleaned smoke, fire and water-damaged property, brought a § 1981 claim against Allstate Insurance Company, similar to the claims at issue here. Allstate had a Qualified Vendor Procedure

("QVP"), under which it maintained a list of approved vendors of emergency repair services. Id. at 1185. When an insured required an emergency repair service, Allstate allowed the insured to select from the QVP vendors. Although the plaintiff alleged that Allstate promised to provide business to its QVP vendors, on the QVP vendor form that the plaintiff filled out with Allstate, it stated, "Allstate will utilize the [QVP] in such a way as to maximize customer service. We have no obligation to refer customers to this particular vendor." Id. (emphasis added). The court concluded that this contractual language was unambiguous, stating, "if [Plaintiff] had no contractual right to equal referrals, then Allstate's failure to provide them with such does not amount to discrimination in the performance of the contract." Id. at 1194, n. 3.

Plaintiff also contended that Allstate violated § 1981 by discriminating on the basis of race when it made referrals leading to contracts between the referred party (plaintiff) and third parties (Allstate's insureds). Id. at 1194-95. The court held that this § 1981 claim failed too:

> Relief is available under § 1981 where a party discriminatorily uses its authority to preclude an individual from securing a contract with a third party. However, this requires the individual to show that the party both possessed sufficient authority to significantly interfere with the individual's ability to obtain contracts with third parties, and that the party actually exercised that authority to the individual's detriment.

Id. at 1197. The court also noted that "a § 1981claim for interference with a right to make and enforce a contract must involve the actual loss of a contract interest, not merely the possible loss of future contract opportunities." Id. at 1195.

Here, the language of the JVA is limited to "Qualified Construction Contracts," i.e., contracts with minority-based requirements. (Ex. A to Complaint.) The contract does not obligate Defendant to bid on behalf of the joint venture for contracts on projects that did not have such minority-based goals

13

or requirements. Plaintiff itself tacitly acknowledges as much, noting that because it wished the joint venture to be more expansive, Plaintiff was "hopeful" that Defendant would also decide to include it on contracts that did not have minority-based goals. (Complaint at ¶ 12.) There was no contractual obligation for Defendant to pursue bids for contracts that did not have minority participation goals. To the extent that Plaintiff contends that Defendant impaired Plaintiff's ability to contract with third parties, Plaintiff has failed to allege that Defendant had the ability or authority to interfere with Plaintiff's prospective contracts. Moreover, even if Defendant had such authority, there is no allegation that Defendant swayed the decision-making of third-party contractors. Nothing in the JVA denied Plaintiff the right to contract with third parties. The Court therefore recommends the dismissal of Plaintiff's § 1981 and MHRA allegations that Defendant failed to seek non-qualified contracts under the JVA.

### 3. Allegations of Refusal to Allow Plaintiff to Perform Work Secured by the Contract, Refusal to Pay Profits and Denial of Access to Financial Books of the Joint Venture

Plaintiff also bases its § 1981 and MHRA claims on discrimination allegedly caused by Defendant's refusal to allow Plaintiff to perform work on contracts secured by the JVA, by refusing to pay profits to Plaintiff and by denying Plaintiff access to the financial books of the joint venture. (Complaint at ¶¶ 25, 28.) Defendant's motion to dismiss did not address these elements of Plaintiff's § 1981 and MHRA claims.

The JVA itself envisions that the parties would contribute equally to the performance of the purpose of the contract, that the cash profits and all income or losses would be distributed and allocated in proportion to each party's contribution relative to the performance of each Qualified Construction Contract, and that both parties would have the right to inspect and examine the books of

account at all reasonable times. (Ex. A to Complaint.) Plaintiff alleges that Defendant's actions in refusing to allow Plaintiff to perform work, refusing to pay profits and denying Plaintiff access to financial records were caused by racial discrimination, based on Ms. Guerra's race. (Complaint at ¶¶ 25, 28.)

Defendant cites no authority, nor offers argument, as to Plaintiff's allegations involving discrimination in the performance and payment under the JVA, or in the right of Plaintiff to inspect the financial books. Viewing the evidence in the light most favorable to Plaintiff, as the Court must, Plaintiff has sufficiently stated a claim of discrimination under § 1981 and the MHRA as to these allegations in ¶¶ 25 and 28 of the Complaint. Accordingly, the Court recommends the denial of Defendant's motion to dismiss these portions of Plaintiff's § 1981 and MHRA claims.

### C.      Lanham Act Claims

Plaintiff alleges that Defendant violated the Lanham Act when it:

> Misrepresented to general contractors and others that it was in a joint venture with plaintiff and that it intended to have or was having plaintiff perform work on construction contracts that plaintiff was not performing or that defendant did not intend to allow plaintiff to perform. These false statements deceived others or caused confusion concerning defendant's affiliation with plaintiff and the origin of defendant's services, thereby damaging plaintiff.

Complaint, ¶ 31. Defendant argues that Plaintiff lacks standing to bring a Lanham Act claim, and even if the Court finds that Plaintiff has standing, Plaintiff fails to state a claim upon which relief can be granted.

Section 43(a) of the Lanham Act provides:

(a) Civil Action

15

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .
>
> ***
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125.

Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition, even absent a federal registered trademark. Williams v. Curtiss-Wright Corp., 691 F.2d 168, 172 (3d Cir. 1982). Courts consider five factors in evaluating a plaintiff's standing:

1. The nature of the plaintiff's alleged injury: Is the injury "of a type that Congress sought to redress in providing a private remedy for violations of the [Lanham Act]?"
2. The directness or indirectness of the asserted injury.
3. The proximity or remoteness of the party to the alleged injurious conduct.
4. The speculativeness of the damages claim.
5. The risk of duplicative damages or complexity in apportioning damages.

Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 233 (3d Cir. 1998) (citing Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519 (1983)).

Discussing these factors, in Brunson Communications, Inc. v. Arbitron, Inc., 239 F.Supp.2d 550, 574 (E.D. Pa. 2002), the Court found that four of the five factors weighed against the plaintiff's

16

standing. As to the first prong, the court found it significant that plaintiff and defendant were not competitors, stating that the focus of the Lanham Act is on commercial interests that have been harmed by a competitor's false advertising. Id. (citations omitted). The court also found the plaintiff's alleged injury to be too indirect and remote to establish standing. Finally, the court concluded that the defendant's alleged damages were highly speculative and that the plaintiff would have great difficulty in proving a direct link between the alleged conduct and actual dollars lost.

Applying these factors to this case, the factors weigh against standing. Here, Plaintiff and Defendant were engaging in a joint venture, rather than competing against each other. While outside of the joint venture, they are separate independent entities engaged in the same type of work, Plaintiff does not allege in the Complaint that they are otherwise industry competitors. In addition, the injuries alleged as a result of the Lanham Act claim are indirect. Noting that Defendant made misrepresentations to general contractors regarding the joint venture, Plaintiff alleges that these misrepresentations "deceived others or caused confusion," thereby damaging Plaintiff. Plaintiff does not specify which contractors were confused as a direct result of such misrepresentations and Plaintiff's damages are speculative. In sum, Plaintiff lacks standing to bring its Lanham Act claim and the Court recommends that Defendant's motion to dismiss this claim be granted.

      **D.**      **Minnesota Deceptive Trade Practices Act Claims**

Plaintiff's allegations under Minn. Stat. § 325D.44, the MDTPA, mirror its Lanham Act allegations. Namely, Plaintiff alleges that Defendant violated the MDTPA by making misrepresentations to general contractors that it was in a joint venture with Plaintiff and that it intended to have or was having Plaintiff perform work on construction contracts that Plaintiff was not performing or that

17

Defendant did not intend to allow Plaintiff to perform. (Complaint at ¶ 34.)

Remedies under the MDTPA are available as follows:

> A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable. Proof of monetary damage, loss of profits, or intent to deceive is not required. Relief granted for the copying of an article shall be limited to the prevention of confusion or misunderstanding as to source.

Minn. Stat. § 325D.45.

Notably, the MDTPA does not permit a private action for damages. Ly v. Nystrom, 615 N.W.2d 302, 310-11 (Minn. 2000); Alsides v. Brown Institute Ltd., 592 N.W.2d 468, 476 (Minn. App. 1999); Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc., 603 N.W.2d 336 (Minn. App. 1999).

Plaintiff did not respond to Defendant's motion to dismiss this claim and apparently concedes that it may not seek monetary damages under the MDTPA. Because injunctive relief is the only remedy available, Defendant's motion to dismiss Plaintiff's MDTPA claim should be granted.

**THEREFORE, IT IS HEREBY RECOMMENDED that:**

**1.** Defendant's Motion to Dismiss (Doc. No. 6) be **DENIED, IN PART, and GRANTED, IN PART**, consistent with this Report & Recommendation.

Dated: May 4, 2005

                               s/Susan Richard Nelson
                              SUSAN RICHARD NELSON
                              United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by May 19, 2005 after being served with a copy thereof.  The objecting party must file with the Clerk of the Court and serve on all parties, written objections which specifically identify the portions of the proposed findings, recommendations, or report to which objection is being made, and a brief in support thereof.  A party may respond to the objecting party's brief within ten days after service thereof. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.